# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | |
|---|---|
| JUSTIN KILLHAM, individually and on behalf of all others similarly situated,<br><br>*Plaintiff,*<br><br>    v.<br><br>SWEEPSTEAKS LIMITED; ADIN ROSS; and AUBREY DRAKE GRAHAM,<br><br>*Defendants.* | Case No.:<br><br>Removed from Circuit Court of Jackson County, Missouri at Independence, Case No. 2516-CV35089 |

## NOTICE OF REMOVAL

Defendants Sweepsteaks Limited, Aubrey Drake Graham, and Adin Ross, by counsel, pursuant to 9 U.S.C. § 205 and 28 U.S.C. §§ 1332, 1441, 1446, and 1453, hereby specially appear for the purpose of removal and, preserving all defenses, including lack of personal jurisdiction and the right to move to compel arbitration, remove this action from the Circuit Court of Jackson County, Missouri. In support of this Notice of Removal, Defendants further allege and state as follows:

### JURISDICTION AND VENUE

1. A defendant has a right to remove where an action brought in state court is one over which the district court has original jurisdiction. 28 U.S.C. § 1441; *see also* 9 U.S.C. § 205 (removal permitted in actions involving certain international arbitration agreements).

2. This Court has original jurisdiction over this action because (1) it is purportedly brought on behalf of a putative class consisting of more than 100 members; (2) minimal diversity exists between the parties; and (3) the amount in controversy exceeds $5 million, exclusive of interests and costs. 28 U.S.C. § 1332(d); *Faltermeier v. FCA USA LLC*, 899 F.3d 617, 621 (8th Cir. 2018).

1

3.     This Court also has original jurisdiction under Chapter 2 of the Federal Arbitration Act (FAA), 9 U.S.C. §§ 201–208, which codifies the 1958 Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention"). Under section 203, the district court has original jurisdiction over an "action or proceeding falling under the Convention," which is deemed "to arise under the laws and treaties of the United States." 9 U.S.C. § 203.

4.     Venue is proper in the Western District of Missouri, Western Division, because the Petition was filed in the Circuit Court of Jackson County, Missouri. This Court is therefore "the district court of the United States for the district and division embracing the place where [the state court action] is pending." 28 U.S.C. § 1441(a); 9 U.S.C. § 205.

## BACKGROUND

5.     On October 27, 2025, Plaintiff Justin Killham commenced a civil action against Defendants Sweepsteaks Limited, Adin Ross, and Aubrey Drake Graham in the Circuit Court of Jackson County, Missouri at Independence, entitled *Justin Killham v. Sweepsteaks Limited et al.* Case No. 2516-CV35089.

6.     Attached hereto as **Exhibit A** are true and correct copies of the Petition ("Pet."), and all pleadings, orders, and other documents in this action that are currently available through the Missouri Case.net system.

7.     Plaintiff Justin Killham resides in Independence, Missouri and is a citizen of Missouri. (Pet. ¶ 11.)

8.     Defendant Sweepsteaks Limited is a Cyprus limited company with its principal place of business in Australia. Sweepsteaks Limited operates an online social gaming platform, Stake.us (the "Platform"). The Platform allows users to play games and win prizes, but users never have to pay to play the Platform's games.

9.     Defendant Adin Ross is a natural person and citizen of Florida.

10.    Defendant Aubrey Drake Graham is a natural person and a citizen of Texas.

11. Defendants executed an acknowledgment of service, waiving further service of the Summons and Petition and any objections to service on December 16, 2025. Accordingly, this Notice of Removal is timely filed. *See* 28 U.S.C § 1446(b); *Monsanto Co. v. Magnetek, Inc.*, 126 F.4th 1324, 1326–27 (8th Cir. 2025) (time to remove triggered by service waiver's effective date).

12. This Notice of Removal is also timely under 9 U.S.C. § 205, which permits removal "at any time" before trial where the subject matter of the state-court action relates to an arbitration agreement falling under the Convention. *See* 9 U.S.C. § 205.

13. A Notice of Filing of this Notice of Removal will be filed promptly in the Circuit Court of Jackson County, Missouri and a copy will be provided to all adverse parties pursuant to 28 U.S.C. § 1446(d).

14. Plaintiff's allegations against Defendants in this action arise from Sweepsteaks Limited's publication of the Platform, which Plaintiff erroneously contends to be an illegal gambling website under Missouri law. (Pet. § IV, VI.)

15. Plaintiff asserts three causes of action, two against all Defendants and one against Sweepsteaks Limited alone. Under the Missouri Merchandising Practices Act (MMPA), R.S. Mo. §§ 407.010 *et seq.*, Plaintiff and the putative class seek monetary and non-monetary relief from all Defendants, including damages, injunctive or other equitable relief, and attorneys' fees and costs. (Pet. ¶ 81.) Plaintiff and the putative class also bring a claim for unjust enrichment against all Defendants, seeking the return of amounts Defendants have allegedly "wrongfully taken" from Plaintiff and putative class. (Pet. ¶ 87.) Finally, Plaintiff brings a claim under the Missouri gambling loss recovery statute, R.S. Mo. § 434.030, seeking recovery from Sweepsteaks Limited of Plaintiff's and putative class members' alleged "gambling losses." (Pet. ¶ 90.)

16. Plaintiff seeks to represent a class broadly defined as: "[a]ll persons in Missouri who gambled and lost money in Stake's online casino at any time during the five (5) years

preceding the filing of this action."[1] (Pet. ¶ 63.)  For the purposes of this Notice of Removal, Defendant refers to the five years preceding the filing of the Petition as the "Relevant Time Period."

17.     Plaintiff's Prayer for Relief purports to request that the Court: (A) determine that this action may be maintained as a class action pursuant to Missouri Rule of Civil Procedure 52.08 and/or R.S. Mo. § 407.025, with Plaintiff designated as class representative and Plaintiff's counsel designated as class counsel; (B) award damages or equitable disgorgement; (C) grant injunctive relief, enjoining Defendants from "engaging in the wrongful and unlawful acts described" in the Petition; (D) statutory interest and penalties; (E) costs and attorneys' fees; and (F) other relief as the Court may deem just and proper. (Pet. § VII.)

18.     If any question arises as to the propriety of removal of this action, Defendants respectfully request an opportunity to conduct discovery, brief any disputed issues, and present oral argument in favor of its position that this case is properly removable.

19.     Defendants have not filed responsive pleadings in the Circuit Court prior to removing this action to this Court.

20.     By removing this action, Defendants do not consent to this Court's exercise of personal jurisdiction over them in this action and reserve the right to move for dismissal on that ground. *Nationwide Engineering & Control Sys., Inc. v. Thomas*, 837 F.2d 345, 347–48 (8th Cir. 1988); *see also Growth Opportunity Connection, Inc. v. Philadelphia Indemn. Ins. Co.*, No. 11-00601-CV, 2011 WL 6141097, at *10 (W.D. Mo. Dec. 9, 2011) ("A defendant does not waive objections to . . . personal jurisdiction by removing a state court action to federal court."). Nor do Defendants waive their right to move to compel Plaintiff to submit his claims to arbitration pursuant to the agreement between Plaintiff and Sweepsteaks

---

[1] Defendant disputes that any Platform user "gambled" by playing the Platform's free-to-play social games. For the purposes of this Notice of Removal, Defendant interprets the proposed class to encompass all persons in Missouri whose Platform purchases exceed prize winnings.

4

Limited. *See Rose v. Jarmon*, No. 4:25-cv-00207-MTS, 2025 WL 1413769, at *1 (E.D. Mo. May 15, 2025) (defendant did not waive right to compel arbitration by removing action to federal court).

**GROUNDS FOR REMOVAL**

21. To remove an action under section 1446(a), Defendant must file a notice of removal containing a "short and plain statement of the grounds for removal." 28 U.S.C. § 1446(a). The notice of removal "need only include a plausible allegation" that the jurisdictional requirements are satisfied. *Dart Cherokee Basin Op. Co., LLC v. Owens*, 574 U.S. 81, 89 (2014).

22. Although Defendants deny any and all liability as to Plaintiff's claims, and deny that this matter should proceed at all, let alone as a class action, removal of this case is proper under 28 U.S.C. § 1332(d), which "provides the federal district courts with 'original jurisdiction' to hear a 'class action' if the class has more than 100 members, the parties are minimally diverse, and the 'matter in controversy exceeds the sum or value of $5,000,000." *Faltermeier v. FCA USA LLC*, 899 F.3d 617, 621 (8th Cir. 2018) (quoting *Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 592 (2013)).

23. As discussed in further detail below, this class action satisfies all requirements for removal under section 1332(d): there is minimal diversity between Plaintiff and Defendants, the proposed class would have more than 100 members, and the amount in controversy exceeds $5 million, exclusive of interests and costs.

24. Further, although Defendants deny any and all liability as to Plaintiff's claims, and deny that this matter should proceed in court at all, removal of this case is also proper under 9 U.S.C. §§ 203, 205 and 28 U.S.C. §§ 1441, 1446. Together, these statutes allow for the removal of any civil action in which the subject matter "relates to an arbitration agreement or award falling under" the Convention. *See* 9 U.S.C. §§ 202–206; *Transit Cas. Co. v. Certain Underwriters at Lloyd's of London*, 119 F.3d 619, 620 (8th Cir. 1997).

5

## A. The Class Action Fairness Act

25. A "class action" under CAFA is "any civil action filed under rule 23 of the Federal Rules of Civil Procedure or similar State statute or rule of judicial procedure authorizing an action to be brought by 1 or more representative persons as a class action." 28 U.S.C. § 1332(d)(1)(B). For removal purposes, CAFA requires that the proposed class consist of at least 100 members. *Id.* § 1332(d)(5)(B).

26. This action is a class action under CAFA. Plaintiff expressly purports to represent a proposed class under Missouri's rule of civil procedure governing class actions, Rule 52.08, which, as the Eighth Circuit has recognized, is "analogous to Rule 23." *Williams v. Emp.'s Mut. Cas. Co.*, 845 F.3d 891, 899 (8th Cir. 2017). Plaintiff further relies on R.S. Mo. § 407.025, which permits actions to be "maintained as a class action in a manner consistent with Rule 23 of the Federal Rules of Civil Procedure and Missouri rule of civil procedure 52.08." R.S. Mo. § 407.025(5)–(6). Because this class action satisfies each jurisdictional requirement, and Sweepsteaks Limited has timely removed, removal is proper under CAFA. 28 U.S.C. § 1332(d).

### i. The proposed class includes more than 100 members.

27. Both Plaintiff's allegations in the Petition and the information set forth in the Declaration of Edward Craven, attached hereto as **Exhibit B** ("Craven Decl."), establish that there are more than 100 members within the proposed class.

28. Plaintiff's proposed class definition broadly includes "[a]ll persons in Missouri who gambled and lost money in Stake's online casino at any time during the five (5) years preceding the filing of this action." (Pet. ¶ 63.)

29. As Plaintiff acknowledges, while he does not know the exact number, "the proposed Class likely includes at least hundreds of members." (*Id.* ¶ 64.)

30. This is consistent with Sweepsteaks Limited's business records. Those records reflect that, during the Relevant Time Period, more than 100 Missouri Platform users'

6

purchases exceeded prize winnings (Craven Decl. ¶¶ 7–9.) Those Missouri users would therefore be members of the proposed class.

31.     Accordingly, Defendants have plausibly alleged that Plaintiff's proposed class would include more than 100 members, satisfying CAFA's threshold requirement for removal.

*ii.*     ***The parties are minimally diverse.***

32.     The minimal diversity requirement is also satisfied. To satisfy CAFA's minimal diversity requirement, at least one member of a class of plaintiffs and at least one defendant must be citizens of different states. *Leflar v. Target Corp.*, 57 F.4th 600, 603 (8th Cir. 2023) (citing 28 U.S.C. § 1332(d)).

33.     Sweepsteaks Limited is a foreign company incorporated and existing under the laws of Cyprus with its principal place of business in Australia. (Craven Decl. ¶¶ 4–5.) It is therefore a citizen of a foreign state for purposes of diversity jurisdiction. 28 U.S.C. § 1332(c)(1).

34.     At the time Plaintiff commenced this action, he was a citizen of Missouri. (Pet. ¶ 11; Craven Decl. ¶ 14.)

35.     Diversity of citizenship therefore exists between at least one defendant, Sweepsteaks Limited and at least one member of the proposed class—Plaintiff. Removal is therefore proper under section 1332(d). *See Leflar*, 57 F.4th at 603.

*iii.*     ***The aggregate amount in controversy exceeds $5 million.***

36.     Finally, the amount-in-controversy requirement is also satisfied. CAFA confers the district court with original jurisdiction over class actions in which "the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interests and costs." 28 U.S.C. § 1332(d). To determine whether CAFA's amount-in-controversy requirement is satisfied, the Court aggregates the claims of all named and unnamed persons who "fall within the definition of the proposed or certified class." *Faltermeier*, 899 F.3d at 621. The question

is not whether damages "are" greater than $ 5 million, but whether a fact finder "*might* legally conclude that they are.*" Raskas v. Johnson & Johnson*, 719 F.3d 884, 886–87 (8th Cir. 2013) (emphasis in original).

37.     There is no "presumption against federal jurisdiction" in CAFA cases. *Brunts v. Walmart, Inc.*, 68 F.4th 1091, 1094 (8th Cir. 2023). Moreover, the removing party's burden of "describing how the controversy exceeds $5 million" is a "pleading requirement, not a demand for proof." *Id.* (quoting *Hartis v. Chicago Title Ins. Co.*, 694 F.3d 935, 944 (8th Cir. 2012)). District courts must accept the allegations in the notice of removal if they are "made in good faith." *Id.* (citing *Leflar*, 57 F.4th at 604). Finally, a defendant need not provide a "formula" or "methodology" for calculating the potential damages, as doing so would improperly require the defendant to "confess liability" for the entire jurisdictional amount. *Raskas*, 719 F.3d 884 (citing *Hartis*, 694 F.3d at 944).

38.     "Compensatory damages, punitive damages, and statutory attorney's fees all count towards the amount in controversy." *Harrington Enters., Inc. v. Safety-Kleen Sys., Inc.*, 42 F. Supp. 3d 1197, 1199 (W.D. Mo. 2013).  In cases involving the MMPA, "sales figures are sufficient to establish the amount in controversy" under CAFA. *Raskas*, 719 F.3d at 888 (sales data sufficient to establish amount in controversy even where plaintiff argues that class definition makes total sales figures "overinclusive").

39.     Plaintiff seeks monetary relief in the form of damages, equitable disgorgement, statutory interests and penalties, and statutory attorneys' fees and costs. (Pet. § VII.)

40.     The MMPA permits Plaintiff to recover actual damages as well as punitive damages. R.S. Mo. § 407.25(1)(1), (2)(1). The MMPA authorizes a court to award attorney's fees to the prevailing party, which must bear a reasonable relationship to the amount of the judgment, or in cases involving equitable relief, be "based on the amount of time reasonably expended." R.S. Mo. § 407.25(2)(2).

41.     According to Sweepsteaks Limited's business records, during the Relevant Time Period, the Platform's revenue from Missouri users' purchases considerably exceeded $5

million. (Craven Decl. ¶ 10.) That alone is enough to demonstrate that the amount in controversy exceeds $5 million. *See Brunts*, 68 F.4th at 1094 (citing *Raskas*, 719 F.3d at 888) (total sales establishes amount in controversy when MMPA lawsuit questions part of a transaction).

42.    Plaintiff's requests for punitive damages and statutory attorneys' fees further increase the amount in controversy far above the $5 million threshold because a factfinder could legally award five times the net amount of the judgment, including statutory attorney's fees. Mo. R.S. § 510.265.1(2); *Raskas*, 719 F.3d at 887 ("When considering the total sales [of, *e.g.*, $3.3 million] in conjunction with the request for punitive damages the amount in controversy requirement is met."); *Hervey v. Mo. Dep't of Corr.*, 379 S.W.3d 156, 165 (Mo. 2012) (attorney's fees included in net amount of judgment for purposes of calculating punitive damages).

43.    Accordingly, while Defendants deny that Plaintiff or the putative class should be or will be entitled to any recovery or relief whatsoever, if the Court were to award the relief sought by Plaintiff, the award would far exceed $5 million. CAFA's amount-in-controversy requirement is therefore satisfied.

**B.  Chapter 2 of the FAA and the Convention**

44.    Removal is also proper under Chapter 2 of the FAA and the Convention.

45.    All users of Sweepsteaks Limited's Platform must accept the Platform's Terms and Conditions when creating a user account. (Craven Decl. ¶ 13.)

46.    When Plaintiff  created his user account on February 11, 2023, he accepted the Terms and Conditions, which included an arbitration agreement. (*Id.* ¶ 13.)

47.    Most recently, on August 12, 2025, Plaintiff accepted the current version of the Terms and Conditions, which also includes an arbitration agreement. (*Id.* ¶ 15.)

48.    The arbitration agreement requires users and Sweepsteaks Limited to submit their disputes to binding, individual arbitration. (Craven Decl., Ex. A.)

9

49.    The arbitration agreement allows users to opt out of arbitration by sending written notice within thirty days of account creation or August 23, 2024, whichever is later. (*Id.*) Sweepsteaks Limited has no record of a written opt-out notice from Plaintiff and the time for him to opt out has expired. (Craven Decl. ¶ 17.)

50.    Section 203 of the FAA confers the Court with original jurisdiction over an "action or proceeding falling under the Convention," "regardless of the amount in controversy." 9 U.S.C. 203.

51.    Section 205 of the FAA further provides that a defendant may, at any time before trial, remove an action to the district court of the United States "for the district and division embracing the place where the action or proceeding is pending." 9 U.S.C. § 205. While the removal procedure "otherwise provided by law shall apply," the availability of removal under the section 205 "need not appear on the face of the complaint." *Id.* It instead may be shown in the notice of removal. *See id.*

52.    The requirements for removal under section 205 are satisfied because the Convention governs the arbitration agreement between the parties. The arbitration agreement is part of the Platform's Terms and Conditions. (Craven Decl. ¶¶ 13–17, Ex. A.) It is therefore an agreement in writing which arises out of a commercial legal relationship. *Transit Cas. Co.*, 119 F.3d at 620; *see also* 9 U.S.C. § 202 (commercial legal relationships include transactions, contracts, or agreements described in section 2 of the FAA). And, because Sweepsteaks Limited is a Cyprus limited company with its principal place of business in Australia, the arbitration agreement is not entirely between citizens of the United States. *See id.*

53.    Finally, because Defendants have removed this action before trial, removal is timely under section 205.

## CONCLUSION

54.    Based on the foregoing, removal is proper under 28 U.S.C. §§ 1332, 1441, 1446, and 1453. Removal is also proper under 9 U.S.C. §§ 203, 205.

55. By removing this action to this Court, Defendants reserve, and do not waive, any defenses, objections, or motions available to them under state or federal law, including the right to move to compel arbitration of Plaintiff's claims and to assert any defense under Federal Rule of Civil Procedure 12(b), including lack of personal jurisdiction.

WHEREFORE, Defendants hereby remove this action from the Circuit Court of Jackson County, Missouri, to the United States District Court for the Western District of Missouri, Western Division. This Notice has been served on all counsel of record on the date and manner stated in the Certificate of Service.

Date: December 23, 2025                    Respectfully Submitted,


**GOOSMANN LAW FIRM**


By: _/s/ Steven C. Henricks_
Steven C. Henricks, #51566
Goosmann Law Firm, PLC
17838 Burke Street, Suite 250
Omaha, NE 68118
Tel. 402.282.8538
henrickss@goosmannlaw.com

A. Jeff Ifrah*
D.C. Bar No. 456661
Robert W. Ward*
D.C. Bar No. 90033268
IFRAH PLLC
1717 Pennsylvania Avenue, NW
Suite 650
Washington, D.C. 20006
jeff@ifrahlaw.com
rward@ifrahlaw.com
*Counsel for Sweepstakes Limited and Aubrey Drake Graham*

11

**NEIMAN MAYS FLOCH & ALMEIDA, PLLC**

By: */s/ Brandon S. Floch*
Brandon S. Floch
Florida Bar No. 125218
bfloch@nmfalawfirm.com
Christopher D. Joyce
Florida Bar No. 1020006
cjoyce@nmfalawfirm.com
201 South Biscayne Blvd., Suite 1300
Miami, Florida 33131
Phone: (305) 434-4943
*Counsel for Adin Ross*

## CERTIFICATE OF SERVICE

I certify that on December 23rd 2025, I filed the above Notice of Removal using the Court's CM/ECF system and served a copy upon counsel for Plaintiff by electronic mail as follows:

CAREY DANIS & LOWE
*/s/James J. Rosemergy (with permission)*
James J. Rosemergy, #50166
8235 Forsyth Blvd, Suite 1100
Clayton, MO 63105
314-725-7700
314-721-0905 (fax)
jrosemergy@careydanis.com

Steven A. Schwartz (PA Bar No. 50579)
Beena M. McDonald (PA Bar No. 83315)
CHIMICLES SCHWARTZ KRINER
 & DONALDSON-SMITH LLP
361 W. Lancaster Avenue
Haverford, PA  19041
T: (610) 642-8500
*sas@chimicles.com*
*bmm@chimicles.com*

12

Garrett W. Wotkyns (AR Bar No. 025887)
CHIMICLES SCHWARTZ KRINER
 & DONALDSON-SMITH LLP
18146 North 93rd Place
Scottsdale, AZ 85255
T: (610) 642-8500
*garrettwotkyns@chimicles.com*

Jarrett L. Ellzey (TX Bar No. 24040865)
Josh Sanford (AR Bar No. 2001037)
Tom Kherkher (TX Bar No. 24113389)
EKSM, LLP
4200 Montrose Blvd, Suite 200
Houston, Texas 770006
T: (888) 350-3931
*jellzey@eksm.com*
*jsanford@eksm.com*
*tkherkher@eksm.com*
Service: service@eksm.com
*Counsel for Justin Killham and the Proposed Class*

Electronically Filed - Jackson - Independence - October 27, 2025 - 03:57 PM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT INDEPENDENCE**

| | |
|---|---|
| **JUSTIN KILLHAM, individually and on behalf of all others similarly situated,** | **Case No.:** |
| **Plaintiff,** | |
| **v.** | |
| **SWEEPSTEAKS LIMITED;** | |
| <u>**Serve:**</u><br>13101 Preston Rd<br>Ste 110-5027<br>Dallas, TX, 75240 | |
| **ADIN ROSS; and** | |
| <u>**Serve:**</u><br>14851 SW 21st St<br>Davie, FL 33326 | |
| **AUBREY DRAKE GRAHAM** | |
| <u>**Serve:**</u><br>10000 Champion Dr,<br>Washington, TX 77880 | |
| **Defendants.** | |
| | **JURY TRIAL DEMANDED** |

## <u>CLASS ACTION PETITION</u>

I.       <u>**INTRODUCTION**</u>

1.       Defendant Sweepsteaks Limited operates the world's most popular and profitable online casino, Stake.com. With the company's revenue reaching $4.7 billion in 2024, one of its founders touted, "Stake has hit a point now where I'm confident our betting volume is the highest in the world out of any casino, land-based or online." Despite its global dominance, which includes sponsoring a prestigious English Premier League soccer club (Everton), the Formula One racing

team Kick Sauber and multiple Mixed Martial Arts (MMA) and Ultimate Fighting Championship (UFC) fighters, Stake.com found itself during the emergence of online casino gambling blocked from entering the U.S. market, where online casino gambling is highly regulated and banned entirely in many states, including Missouri.

2.        To evade these restrictions, Sweepsteaks Limited created Stake.us (together, "Defendant" or "Stake"), which conducts online casino gambling in open violation of Missouri state gaming and consumer protection laws. Stake.us is a platform marketed to Missourians as a so-called "social casino" that does not permit real gambling. But Stake.us is a virtual clone of Stake.com, rebranded to mislead Missouri regulators and consumers into believing it offers harmless gameplay instead of an unlawful gambling platform.

3.        On Stake.com, players buy chips, gamble and cash out their winnings—just like at a regular casino. But Stake knew that openly selling casino chips to U.S. customers would immediately expose Stake.us as an illegal online casino.

4.        To hide the true nature of its online gambling operation, Stake asserts that the only chips it sells to consumers are tokens called "Gold Coins," which can only be used for "casual" gameplay on the Stake.us platform, have no real-world value, and can never be cashed out. However, Stake bundles every purchase of Gold Coins with a second type of token called "Stake Cash" as a supposedly free bonus. Unlike Gold Coins, Stake Cash can be wagered on casino games and cashed out for real money at a fixed 1:1 ratio to the U.S. Dollar – exposing Stake Cash as a clear vehicle for real-money gambling.

5.        Stake's pricing structure for its American "social casino" confirms that the true purpose of these transactions is to sell Stake Cash—not Gold Coins. Every dollar spent buys players an equivalent amount of Stake Cash, plus an enormous quantity of nearly worthless Gold

Coins. For example, $20 buys 20.05 Stake Cash (and 200,000 Gold Coins), $50 buys 50.12 Stake Cash (and 500,000 Gold Coins), and so on. Despite Defendant's claim that players are purchasing harmless virtual tokens, the pricing structure and game play reveal that Stake Cash—not Gold Coins—is the real product Stake is selling to entice players into engaging in real-money gambling. The Gold Coins merely serve to deceive regulators and lure players under the guise of "safe" entertainment.

6.     Virtual gambling is highly addictive and strictly regulated in Missouri. By law, games such as those offered online through Stake are illegal in Missouri.  On April 23, 2025, the Missouri Gaming Commission issued a Public Service Announcement stating, in relevant part:

> The Missouri Gaming Commission is issuing this Consumer Protection Alert to inform Missourians of a concerning nationwide trend that has made its way to Missouri.  Fraudulent operators are falsely claiming that legitimate casinos in Missouri have launched online gaming platforms.
>
> Advertisements have surfaced on social media feeds announcing Missouri Casinos are "going online." The advertisements use genuine photos from the casino websites to represent the corporation and specific Missouri casinos.
>
> Online casinos are illegal in Missouri. Any claims otherwise should be treated as highly suspicious. These scams not only put players at a financial risk, but they also undermine the integrity of Missouri's regulated gaming industry. Due to their unregulated nature, MGC is unable to resolve complaints and disputes arising from unregulated and illegal gaming sites, leaving victims with little to no chance of recovering lost funds.  It is important to remember that just because you can download the app, visit the website, and play the games, it does not mean it is a legitimate and legal gaming platform.[1]

By offering Stake Cash that can be wagered on games of chance over the Internet and redeemed for real money, Stake is operating an unlicensed and illegal online casino in Missouri.

---

[1] https://www.mgc.dps.mo.gov/CommissionNews/CommNews/2025_PSA%20Fraudulent%20Online%20Casinos.pdf (last viewed on Oct. 23, 2025).

7.      Stake's deceptive trade practices have inflicted severe harm on the vulnerable in Missouri, and especially on individuals prone to gambling addiction and younger consumers targeted through Stake's "free play" marketing.

8.      Stake, in fact, has flooded social media platforms in Missouri and elsewhere with slick ads, "influencer" videos and flashy visuals, making its games seem safe, fun and harmless. By masking its real-money gambling platform as just another "social casino," Stake creates exactly the kind of dangerous environment that Missouri gaming laws exist to stop. This deliberate deception exposes Missouri consumers to significant risks of financial ruin, psychological distress and gambling addiction.

9.      In addition to the Stake entities named as a defendant herein, the so-called online "influencers" who post videos of themselves gambling in Stake.com's online casino through social media applications and thereby steer commercial traffic to Stake.com and Stake.us are liable for violating Missouri law. Stake in particular pays online influencer-Defendants Adin Ross ("Ross") and Aubrey Drake Graham ("Drake") each millions of dollars yearly to engage in promotional "livestream" online casino gambling with Stake.com – which, as the name implies, does indeed influence consumers in Missouri and elsewhere to gamble with Stake.us.  But Drake and Ross do so under deeply fraudulent pretenses.  To wit, when Ross and Drake purport to gamble online with Stake.com, they often do not do so with their own money despite telling the public in Missouri and elsewhere the opposite.[2] This fact is not shared with the public in Missouri by Stake and/or Ross

---

[2] *See, e.g.*, https://readwrite.com/drake-accused-of-playing-with-stakes-house-money-in-8-million-loss/ (last viewed on Oct. 24, 2025); https://www.mediamatters.org/amazon/influencers-and-right-wing-figures-are-promoting-crypto-gambling-and-sports-betting-young ("Many of these figures, including Ross, have landed major sponsorship deals with gambling companies and are sometimes given house money to gamble with, removing the actual risk associated with online gambling.") (last viewed on Oct. 24, 2025).

and/or Drake. These acts are deceptive, fraudulent and unfair and violate Missouri law.

10.    Plaintiff, on behalf of himself and all others similarly situated, seek here recovery of gambling losses with Defendants, an award of class counsel's fees, an injunction against further violations, reimbursement of expenses and costs of suit as allowed by law and such other relief as the Court deems just and proper.

## II.    PARTIES

11.    Plaintiff Justin Killham lives in Independence, Missouri and lost money gambling in Defendants' online casino as a result of Defendants' wrongful trade practices as set forth further below, including within the last 3 months.

12.     Defendant Sweepsteaks Limited is a Cyprus Limited Company with its principal place of business located at 28 Oktovriou, 313 Omrania BLD, Limassol, CY-3105, Cyprus.

13.     Defendant Adin Ross is an individual residing in Davie, Florida.

14.     Defendant Aubrey Drake Graham is an individual residing in Washington, Texas.

## III.    JURISDICTION AND VENUE

15.    Jurisdiction is properly vested in this court because the claims for relief asserted herein arose here.

16.    Venue is properly vested in this circuit and division pursuant to RSMo § 478.461(2) because the claims for relief asserted herein arose here.

17.    Plaintiff does not plead, expressly or implicitly, any cause of action or request any remedy that arises under federal law.

18.    Plaintiff hereby demands trial by jury on all claims to the extent permitted by law.

## IV.    FACTUAL ALLEGATIONS

**A.    Defendant Stake is an Online Casino That Facilitates and Profits Enormously from Real-Money Gambling.**

19.     In the United States, lawful gambling has historically been limited to physical casinos or authorized venues where regulatory agencies and oversight bodies closely monitor gambling operations and enforce compliance with established standards. These controlled environments are designed to protect consumers by promoting fairness, ensuring transparency and maintaining safeguards against exploitation and misconduct.

20.     With advancements in technology, gambling has expanded beyond physical venues to online platforms, creating new opportunities and challenges for regulators. States that permit online gambling have adapted their legal frameworks to uphold the same standards of consumer protection and regulatory accountability established for traditional casinos. In states where online casino gambling is permitted, casino platforms are required to operate transparently, offering clear money-for-chance exchanges that are explicitly acknowledged as gambling and are subject to strict regulatory oversight to ensure compliance with state laws.

21.     Online gambling is not permitted in Missouri. This prohibition reflects the state's public policy against online gambling, ensuring that consumers are not exposed to the risks of fraudulent or predatory practices commonly associated with such operations, especially where, as here, they are accessible 24 hours-a-day, 7 days-a-week through computers and mobile devices. Despite Missouri's clear prohibition on online casino gambling, Stake.us operates as a thinly disguised copy of Stake.com that is accessible to Missourians – in other words, an openly acknowledged online casino gambling site. Indeed, a side-by side comparison of the two platforms reveals that Stake.us is virtually identical in appearance and layout to Stake.com, as illustrated by Figures 1 and 2, below:

 

**(Figure 1, Defendant Stake.us)**          **(Figure 2, Defendant Stake.com)**

22.       Both websites prominently feature many of the same casino games and share identical color schemes, graphics, logos, visual themes and have virtually indistinguishable user interfaces. These similarities are no accident—Stake.us was deliberately created as a replica of Stake.com's highly profitable gambling platform in an attempt to evade state gambling regulations such as those in Missouri. As discussed below, the Stake.us casino platform allows players to purchase and wager "Stake Cash" – which is a series of digital tokens that, like chips in a brick-and-mortar casino, can be redeemed at a 1:1 ratio to the U.S. Dollar – on games of chance, including slot machines, bingo, blackjack, roulette and other casino-style offerings. Effectively, then, Stake operates an unlicensed and illegal online casino within Missouri.

**B.       Stake's Platform Provides Games of Chance That Replicate An Authentic Casino Experience.**

23.       Stake provides players with online casino-style games, including virtual slot machines, bingo, scratch cards and roulette. These games are designed to be pure games of chance, with outcomes entirely dictated by algorithms simulating randomness. Players have no genuine ability to influence outcomes through skill or strategy. Stake recognizes this, touting that its "[s]lot

games are fun games of chance"[3] and that its "[s]cratch card games are a game of luck."[4]

24.     A game of chance involves any activity where an outcome is determined predominantly by chance rather than skill. Defendant's games fall squarely within this concept because players wager Stake Cash on virtual casino-style games whose outcomes are determined exclusively by random number generators ("RNGs"),[5] precisely replicating the randomness and unpredictability of physical slot machines and other chance-based games found in brick-and-mortar casinos. Defendant aggressively emphasizes the purely chance-based nature of its games to entice players with the prospect of substantial payouts. Stake frequently promotes the potential for large winnings on its branded social media channels, as illustrated in Figure 3 below:



**(Figure 3)**

---

[3] https://stake.us/casino/home (last accessed Sept. 28, 2025).
[4] https://stake.us/casino/group/iconic21 (last accessed Sept. 28, 2025).
[5] There can be no dispute that Stake's games are considered "games of chance", as Stake admits that its RNGs use "an algorithm that produces a random sequence of numbers which cannot be predicted. RNGs are at the core of online slot games and virtual table games, providing the excitement that makes them so entertaining to play." https://stake.us/blog/understanding-random-number-generators-rngs (last accessed Sept. 28, 2025).

25. Figure 3 prominently advertises a massive payout on Stake's "Sugar Rush 1000" slots game, where a small wager of 5 Stake Cash resulted in a 63,623.50 Stake Cash win—a multiplier of 12,724.70 times the original bet. This form of marketing strategically exploits consumers' hope for enormous returns despite slim odds. The Sugar Rush 1000 game itself is depicted in Figure 4 below:



**(Figure 4)**

26. The absence of skill components further underscores the games' reliance on chance. For instance, virtual slot machines require only the push of a button to spin reels whose outcomes are entirely RNG-determined. Similarly, bingo and scratch cards depend exclusively on random chance, offering players no opportunity to influence outcomes. Defendant purposefully replicates key features of licensed casino games to deliver an authentic gambling atmosphere. The visual design—including spinning reels, celebratory animations, jackpot notifications, and dynamic audio effects—is intentionally crafted to trigger psychological responses identical to those

experienced in traditional casinos.

27. By offering these games of chance, Defendant is operating an unregulated online casino in violation of Missouri law. Defendant's deliberate creation of realistic casino experiences reinforces the unlawful nature of its operations and amplifies the risks to Missouri residents.

28. But Defendants do not stop at virtual slots or simulated games. To further enhance authenticity, Stake offers "Live Dealer Games" which it describes as allowing players to "interact with human dealers" and experience "what it would be like to be at a land-based casino while you're sitting comfortably at home behind your computer screen or on your mobile device."[6] Stake explained how Live Dealer Games function in a February 4, 2024, blog post, a screenshot from which is shown below in Figure 5:[7]



**How Do Live Dealer Games Work?**

Live dealer games are filmed in a studio with a human dealer and are uploaded in a live stream for your enjoyment. As a result, they provide a hybrid experience between playing online casino games and playing at physical casinos.

Rather than relying solely on RNG games, live dealer games utilize real cards and real tables, offering you a much more realistic and immersive experience.

This makes live dealer games extremely popular amongst online gamers, as you can see the roulette wheel spin or the cards being dealt in real time by your casino games hosts.

**(Figure 5)**

29. Stake's Live Dealer Games feature professionally trained dealers seated at real casino tables, using physical playing cards, roulette wheels, and other genuine casino equipment, as depicted in Figures 6 and 7, below:

---

[6] https://stake.us/blog/how-to-play-live-dealer-games (last accessed Sept. 28, 2025).
[7] *Id.*



**(Figure 6, Live Blackjack Table)**



**(Figure 7, Live Roulette Table)**

30.     At these Live Tables, players wager Stake Cash, communicate via live chat with dealers and other players, and watch as dealers physically handle cards or spin the roulette wheel in real time. The realistic, immersive nature of these live dealer interactions intensifies the gambling experience, rendering it indistinguishable from gambling at traditional casinos. For

example, Figure 6 illustrates a live blackjack session, where participants actively wager Stake Cash directly against the dealer. Similar to traditional casinos, players directly win or lose real money based on each hand's outcome, reinforcing the genuine gambling environment that Stake carefully cultivates.

31.     By offering these chance-driven, realistic casino experiences online, Stake violates Missouri law, which strictly prohibits Internet casino gambling to protect consumers. Stake's conduct fosters precisely the addictive, financially ruinous and psychologically damaging activities that Missouri law aims to prevent. This blatant disregard for regulations underscores the urgent need to protect consumers from Stake's unlawful and predatory practices.

### C.     Stake's Dual Currency System

32.     Although Stake.com openly operates as the largest online casino in the world, it is barred from offering real-money gambling to consumers in the United States. To circumvent this prohibition, Stake created Stake.us, a nearly identical clone of Stake.com that is rebranded as a free-to-play "social casino." Unlike at Stake.com, Stake prominently represents that the Stake.us "PLATFORM AND GAMES DO NOT OFFER REAL MONEY GAMBLING."[8] (emphasis in original.) This construct relies entirely on a dual-currency system intentionally designed to obscure the fact that players are engaging in real-money gambling.

33.     Missouri players on Stake.us are introduced to two types of virtual currency: Gold Coins ("GC"), which hold no monetary value and are marketed as being solely for entertainment purposes, and Stake Cash ("SC"), which can be redeemed for real money at a 1:1 exchange rate to the U.S. Dollar and serves as the true currency of Defendant's illegal gambling operations. Gold Coins are presented as the primary currency for casual gameplay. Players can earn a limited

---

[8] https://stake.us/policies/terms (last accessed Sept. 28, 2025).

number of Gold Coins through daily logins or promotions and thereafter may purchase more Gold Coins to keep playing. Stake makes it clear that "Gold Coins are a virtual currency with no monetary value and can only be used for fun play. They cannot be redeemed."[9]

34.     Stake Cash, on the other hand, is the true currency driving Stake's unlawful online gambling operations. Although Stake markets Stake Cash as merely a bonus token included with Gold Coin purchases, Stake Cash has direct monetary value and can be redeemed at a fixed 1:1 ratio with the U.S. Dollar. Stake requires players to purchase Gold Coins and redeem Stake Cash using FIAT or cryptocurrency, including Bitcoin and Ethereum.[10] To that end, Stake explicitly informs players that: Stake Cash will be redeemable at an implied rate of 1 Stake Cash per 1 USD. As such, the amount of cryptocurrency that can be redeemed per 1 Stake Cash will be determined by the market price of that cryptocurrency in USD at the time of such redemption. Thus, despite Stake's deceptive claims, Stake Cash functions as real currency by directly linking virtual wagers to actual monetary value, allowing players to seamlessly convert their virtual gambling winnings into real-world money.

35.     Though Stake tells players that no purchase is necessary to obtain Stake Cash, this representation is highly misleading. Players may acquire limited free Stake Cash through occasional promotions – such as receiving a single Stake Cash per day as a "Daily Login Bonus" or five Stake Cash by completing a cumbersome mail-in request – but these methods are deliberately obscure, impractical, and insufficient for regular gameplay. Ultimately, once a player's promotional Stake Cash is exhausted, the only viable way to continue gambling is to purchase additional Stake Cash. To obtain more Stake Cash, players must buy coin bundles

---

[9] https://help.stake.us/en/articles/6453222-redeeming-rewards (last accessed Sept. 28, 2025).
[10] https://help.stake.us/en/articles/6453199-how-to-make-a-purchase-with-crypto-on-stake-us (last accessed Sept. 28, 2025).

containing both Gold Coins and Stake Cash. Stake characterizes these transactions as primarily Gold Coin purchases with Stake Cash supposedly included as a "free" bonus. However, the pricing structure makes it clear that players are actually paying for Stake Cash.

36.     For every dollar spent on the coin bundles, players receive a nearly equivalent amount of Stake Cash, as illustrated in Figure 8, below. For example, a bundle of 200,000 Gold Coins and 20.05 Stake Cash costs $20, a bundle of 500,000 Gold Coins and 50.12 Stake Cash costs $50, and a bundle of 3,000,000 Gold Coins and 300.75 Stake Cash costs $300. This pricing structure shows that Gold Coins serve only as a superficial disguise for the transaction of Stake Cash.



**(Figure 8)**

37.     Upon information and belief, Stake players regularly buy additional coin bundles when they run out of Stake Cash, even when they already possess hundreds of thousands or even millions of unused Gold Coins. The fact that players are making these repeated purchases when they have ample Gold Coins confirms that these transactions are driven entirely by the desire to obtain Stake Cash for real money gambling, rather than for the Gold Coins that Stake claims to sell.

38.     Stake's dual-currency structure transforms what appears to be an innocuous gaming platform into an unregulated online casino where players use real money to gamble on games of chance. Courts throughout the country have found that when players spend money to obtain more "entries" or "bonus currency" despite already possessing unused amounts of the purported product (here, Gold Coins), there is unmistakable evidence that the "sweepstakes" or "promotion" is merely a front for gambling.

**D.     Stake Calls Itself a "Social Casino" to Lure Consumers and Hide Its Illegal Gambling Operation.**

39.     Stake promotes itself as a "Social Casino" to avoid gambling regulations and reassure potential players that it offers casino-style games purely for entertainment, without real money stakes. Stake explains to consumers that:

> A Social Casino refers to an online platform that offers casino-style games for entertainment purposes, without involving real money. Instead, we use tokens (Gold Coins and Stake Cash). Users can enjoy a variety of casino games, such as slots, roulette and blackjack, but with the use of virtual currency–tokens–rather than real money. Platforms like ours are focused on creating a social and interactive gaming experience, allowing players to connect with friends, share achievements, and participate in virtual communities.[11]

---

[11] https://help.stake.us/en/articles/8570538-what-is-a-social-casino-and-sweepstakes (last accessed on Sept. 28, 2025).

40.     As part of its scheme to brand itself as a mere "social casino," Stake explicitly and fraudulently represents to consumers through its terms of service that its "PLATFORM AND GAMES DO NOT OFFER REAL MONEY GAMBLING." (emphasis in original). Stake even goes so far as to represent that its "social casino has been tailor-made to provide the ultimate social, safe and free gaming experience." (emphasis added). These false representations intentionally mislead consumers into believing that they are participating in harmless gameplay rather than actual real-money gambling, even when wagering with Stake Cash.

41.     Stake further attempts to give consumers in Missouri (and elsewhere) additional comfort that they are not violating the law by identifying certain states where the platform is prohibited, thus creating the false and deceptive impression that Stake is being transparent about the legality of its platform. Stake tells consumers that users in the "Excluded Territories" of Washington, New York, Nevada, Idaho, Kentucky, Michigan, Vermont, new Jersey, Delaware, West Virginia, Pennsylvania, Rode Island, Connecticut, Maryland, Louisiana, Montana and Arizona may not use the site.[12] Indeed, Stake represents to consumers that it "operate[s] within the legal frameworks of states that permit Social Casino platforms" and that "[n]ot every state falls under this category, so to prevent misuse, we need to ensure that our customers come from the allowed states, *steering clear of those where our services aren't legally permitted*."[13] (emphasis added). Stake's terms of service also purport to exclude consumers in these states from its platform. However, once consumers join, the platform's carefully designed features start to funnel them away from casual gameplay (using Gold Coins) and into real-money gambling (using Stake Cash). Indeed, Stake deceptively describes Stake Cash as just another virtual token with "no cash value":

---

[12] https://stake.us/policies/terms (last accessed Sept. 28, 2025).
[13] https://help.stake.us/en/articles/8570611-why-do-i-need-to-verify (last accessed Sept. 28, 2025).

Stake Cash is our virtual token currency, and this token–like Gold Coin–has no cash value. You may receive it as a free bonus with a Gold Coin bundle purchase, or obtain it up through cool promotions we offer on the platform. Not to forget the daily bonuses! Oh, and guess what? Stake Cash isn't just a token; you can redeem it for crypto prizes.[14]

42.    This representation is intentionally misleading. As discussed above, Stake Cash has direct monetary value and serves as the core component of Stake's gambling operation. Thus, while Stake publicly portrays itself as a harmless "social casino," it purposefully disguises the true nature of its platform, trapping unsuspecting consumers into real-money gambling under the guise of casual entertainment.

43.    Stake reinforces this deception through a carefully designed interface that seamlessly transitions players from casual gameplay using Gold Coins to gambling real money with Stake Cash, as illustrated below in Figures 9 and 10, which depict Stake's casino-style slot game, Wheel Big Winner:

 

**(Figure 9, Wagering Gold Coins)**        **(Figure 10, Wagering Stake Cash)**

44.    At the top of every game on Stake's platform are toggles that enable players, with just a single click or tap, to switch between wagering non-monetary Gold Coins and Stake Cash. Figure 9 illustrates the game screen when a player wagers Gold Coins, and Figure 10 illustrates

---

[14] https://help.stake.us/en/articles/6389246-sweep-coins-stake-cash (last accessed Sept. 28, 2025).

the seamless shift to wagering Stake Cash. This simple toggle mechanism is designed to make it as easy as possible for players to transition from casual, risk-free play to gambling with real world stakes. Players who start out playing for fun—believing they are enjoying a harmless, "social" casino experience—can quickly and effortlessly shift to risking actual money without fully appreciating the financial consequences.

45.     For these reasons, many players are misled into believing they are engaging in harmless gaming, only to find themselves spending significant sums of money chasing Stake Cash winnings. Stake's platform uses celebratory animations, sound effects, and other psychological triggers (hallmarks of traditional slot machines) to keep players engaged and spending. This manipulation disproportionately affects vulnerable populations, including individuals susceptible to gambling addiction, who may not recognize the financial stakes until they have already suffered significant losses.

46.     To make matters worse, Stake imposes confusing "playthrough" requirements that make it more difficult for players seeking to redeem their winnings: For every amount of Stake Cash that you receive as a bonus alongside your purchase of Gold coins, you would need to play it through at least 3x over before redemption is available. So only Stake cash received alongside your purchase would have a rollover. Here is an appropriate example: If you purchase Gold coins and receive 10 Stake cash as a bonus, you are required to play through with at least 30 Stake cash before redemptions are available. After you complete the rollover you are free to redeem prizes with those funds, however if you, in the meantime, receive more Stake Cash alongside a new purchase Redemption section will still be locked until that amount of Stake Cash is played through 3X.

47.     In other words, players must repeatedly wager their Stake Cash winnings three

times before they can redeem them for real money. This convoluted "playthrough" requirement significantly restricts players' ability to withdraw their winnings and compels them to keep gambling, thereby increasing their risk of further losses. Such deceptive practices not only underscore the fundamentally gambling-oriented nature of Stake's platform but also highlight the substantial risks it poses to unsuspecting users initially drawn in by promises of harmless entertainment.

E.  **Stake Aggressively Employs "Influencers" Like Ross and Drake on Social Media to Market its Online Casino Gambling.**

48.     Stake leverages extensive social media campaigns to promote Stake, reaching millions of consumers across platforms such as Instagram, TikTok, and X. Stake's advertisements frequently feature videos of prominent influencers and celebrities gambling with Stake Cash and winning massive amounts, as illustrated in Figures 11 and 12 below:



**(Figure 11)**                    **(Figure 12)**

49.     Figures 11 and 12 show screenshots of videos featuring paid influencers that Stake has prominently posted on its Instagram account. Figure 11 depicts an influencer known as "jaredfps" winning 100,000 Stake Cash playing Stake's Plinko game, promoted with the caption,

"HUGE DUB! A 100k SC hit for @jaredfps after yet another 1000x Plinko drop." Figure 12 depicts influencer "blessedmma" winning over 5,000 Stake Cash while playing the "Bonsai Banzai" slots game. These influencer videos emphasize large monetary rewards using celebratory animations and visuals of virtual coins cascading across the screen, enhancing the allure of gambling. By showcasing popular influencers achieving substantial wins, Stake strategically employs social proof and aspirational marketing to give the misleading impression that large payouts are common, enticing users to shift from casual play into real-money gambling with Stake Cash.

50.     Stake also routinely publishes social media posts highlighting enormous player wins across various casino-style games, intentionally spotlighting the potential for massive returns from modest wagers. As illustrated in Group Figure 13, below, these posts feature eye-catching graphics to highlight extraordinary outcomes, such as a 16,907.50x multiplier on the "Joker Jam" slot that turned just 2 Stake Cash into 33,815 Stake Cash, a 606,960 Stake Cash payout on "Drac's Stacks," and an astounding 500,000 Stake Cash win from a single game of Keno:



**(Group Figure 13)**

51.     These large payouts frequently promoted by Stake – such as the Joker Jam win of approximately 17,000x, Drac's Stacks win of 6,000x, and the Keno win of 500x – represent highly

improbable events. Industry research suggests that a win exceeding 16,000x occurs less than once in tens of millions of spins, while a 6,000x payout typically occurs fewer than once per several hundred thousand attempts, and even a 500x return has less than a 0.01% probability per spin.[15] By prominently advertising these exceedingly rare outcomes, Stake exploits players' cognitive biases, creating a misleading impression that such extraordinary wins are achievable and frequent, thereby encouraging impulsive and risky gambling behaviors. Stake's deliberate use of this deceptive marketing tactic exploits consumers' cognitive biases, driving them to make impulsive wagers and chase unrealistic payouts, often resulting in significant financial losses and gambling-related harm.

52.     Stake also heavily promotes itself through celebrity endorsements and major sports sponsorships. Its most prominent partner is the internationally famous rapper and Defendant Drake, whose public wagering of enormous sums on Stake.com has created what industry experts call the "Drake Effect"—massively boosting the Stake brand's popularity, especially among younger, impressionable audiences who admire Drake's glamorous lifestyle. Drake is also directly sponsored by both Stake.us and Stake.com, which prominently feature him on their webpages, strategically using his celebrity influence to encourage impressionable users to gamble. Stake.us boasts that Drake "has been a long-time member of the Stake community" after which a "partnership was formed" where "a new gaming experience" will allow users to "have a chance to win big along side Drake. This type of giveaway will be on a magnitude unseen before."

---

[15] *See, e.g.*, https://www.gamblingcommission.gov.uk/public-and-players/guide/return-to-player-how-much-gaming-machines-payout (last accessed Sept. 24, 2025).



53. Drake's involvement is further described on Stake.com as a "Journey from a Player to a Partner" and touts "Drake's Live Stream Giveaways & Rewards" as well as his "Stake History in the Making."



54.     Even Drake's official Instagram account ("champagnepapi") and X account ("Drizzy") prominently display his partnership with Stake, which reach over 142 million and 38 million followers respectively. That placement puts it ahead of his other ventures, including Nocta

(his Nike sublabel), October's Very Own (his record label), Better World Fragrance House, and even his official fan club. On one of the most-followed accounts in the world, this kind of visibility elevates Stake far beyond the typical world wide web platform—it becomes a centerpiece of Drake's brand ecosystem.



55.     Drake and Ross livestream betting on platforms like Kick.com ("Kick"), which is also backed by the founders of Stake.[16] In late 2022, the founders funneled Stake profits into launching Kick—built to rival the earlier-developed livestream platform Twitch.com ("Twitch")—just months after Twitch blacklisted Stake ads over consumer protection concerns.[17]

---

[16]  *See* https://www.forbes.com.au/news/billionaires/how-stake-made-australias-ed-craven-a-crypto-billionaire/ (last accessed Sept. 8, 2025).
[17] *Id.*

In response, they revived Stake's original playbook: relaxed rules, generous payouts, and aggressive creator incentives. Kick offered streamers 95% of subscription revenue—nearly double Twitch's cut—and signed top talent with multimillion-dollar deals. The platform quickly made waves, but its loose moderation policies attracted controversial figures and questionable content, complicating its path to mainstream ad partnerships.





56.    But Drake's role as Stake's unofficial mascot is quietly corrosive—he's glamorizing the platform to millions of impressionable fans, many of whom treat his wild betting habits like gospel. What makes it even more unsettling is that Stake apparently fronts Drake and Ross "house money," so any reported losses are part of a marketing tactic designed to draw attention. Stake's influencer marketing, especially through Drake and Ross, is directed among others at teenagers in Missouri and in other states.[18]

57.    As one industry commentary puts it:

> Drake becoming Stake's cultural mascot is insidious—he's marketing the app to millions of aspirational obsessives, turning his fanbase into a horde of gambling degenerates who trust their favorite influencers' baseless "calls" with divine faith. It's astrology for boys nursed on Barstool. It's even darker because Stake likely gives Drake credit to use for promotions, so there are no stakes to him going berserk with bets. He always wins.[19]

58. Another industry perspective states:

> Ross is an example of influencers . . . who are promoting crypto gambling and sports betting ventures to their young audiences. Many of these figures, including Ross, have landed major sponsorship deals with gambling companies and are sometimes given house money to gamble with, removing the actual risk associated with online gambling.[20]

59.    Stake's and Drake's and Ross's conduct here threatens the welfare of Missouri residents and especially its young people.  The National Institutes of Health in a 2021 white paper observed that "[d]espite its illegality among adolescents, online gambling is a common practice,

---

[18] *See, e.g.*, https://www.mediamatters.org/amazon/influencers-and-right-wing-figures-are-promoting-crypto-gambling-and-sports-betting-young ("Influencers are promoting these games to young viewers as gambling addiction rises among adolescents and horror stories about streamers and followers draining their bank accounts are popping up across the internet." (last accessed Oct. 10, 2025).

[19] *See* https://pitchfork.com/thepitch/on-drakes-gambling-streams-everybody-loses/ (last accessed Oct. 10, 2025).

[20] *See* https://www.mediamatters.org/amazon/influencers-and-right-wing-figures-are-promoting-crypto-gambling-and-sports-betting-young (last accessed Oct. 10, 2025).

Electronically Filed - Jackson - Independence - October 27, 2025 - 03:57 PM

which puts their mental health and well-being at serious risk."[21]

60.    Stake similarly sponsors global sports franchises and famous athletes, including Everton FC in the English Premier League, the Formula One racing team Kick Sauber and multiple MMA and UFC fighters including Israel Adesanya, who also post for Stake.



These partnerships associate Stake with the excitement and legitimacy of elite professional sports. The point of Stake's aggressive sponsorship strategy is clear: by linking itself with globally admired celebrities and teams, Stake aims to normalize online gambling, increase consumer trust and disguise the risks of gambling behind an appealing entertainment-focused image.

61.    Critically, Stake.us and Stake.com sponsor the exact same celebrities and sports teams, further demonstrating that Stake.us is simply a strategic copy of Stake.com, deceptively rebranded as a "social casino" to evade gambling regulations.

62.    Through its targeted and misleading marketing, Stake attracts users who remain largely unaware of the financial and emotional dangers involved, allowing Stake to maximize

---

[21] *See* https://pmc.ncbi.nlm.nih.gov/articles/PMC8997231/ (surveying public health risks posed by online casino gambling) (last accessed Oct. 10, 2025).

profits while escaping the accountability, oversight, and consumer protections required of legitimate gambling operations.

## V.    CLASS ACTION ALLEGATIONS

63.    Plaintiff brings this action on behalf of himself and all others similarly situated under Missouri Supreme Court Rule 52.08 and R.S.Mo. § 407.025(5-6) as representative of a Plaintiff Class ("Class") defined as:

> All persons in Missouri who gambled and lost money in Stake's online casino at any time during the five (5) years preceding the filing of this action.

64.    Members of the Class are so numerous that the individual joinder of all absent Class Members is impracticable. While the exact number of Class Members is unknown to Plaintiff at this time, the proposed Class likely includes at least hundreds of members.

65.    Common questions of law and fact exist as to all Members of the Class. These questions predominate over any questions unique to any individual Member of the Class and include, without limitation:

a.    Whether Defendants engaged in unlawful, unfair or deceptive business practices by advertising and selling their online casino services and products as described herein;

b.    Whether Defendants' sales practices constitute an unfair method of competition or unfair or deceptive act or practice in violation of Missouri consumer protection law;

c.    Whether Defendants violated R.S.Mo. § 407.020 et seq as to Plaintiff and the Class;

d.    Whether Defendants' online gambling casino is a "gambling device" within the meaning of R.S.Mo. § 572.010, et seq;

e.    Whether Plaintiff's and the Class's losses constitute "money lost at gaming"

as that term is used in R.S.Mo. § 434.030;

f.      Whether Defendants were unjustly enriched at the expense of Plaintiff and the Class;

g.      Whether Defendants used deceptive representations and omissions in connection with the sale of their online casino services and products to Plaintiff and the Class;

h.      Whether Defendants represented that their online casino has characteristics or quantities that it actually does not have in violation of Missouri consumer protection law;

i.      The appropriate measure of damages to be paid to Plaintiff; and

j.      Whether injunctive relief is appropriate to halt Defendants' practices as complained of herein.

66.     Plaintiff's claims are typical of the claims of the Class. Defendants' actions have affected Class Members equally because those actions were directed at Plaintiff and Class Members and affected each in the same manner. Accordingly, Plaintiff's claims against Defendants based on the conduct alleged in this Complaint are identical to the claims of other Class Members.

67.     Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff has no interests adverse to the interests of the Class. Plaintiff is committed to prosecuting this action to a final resolution and has retained competent counsel who have extensive experience in prosecuting complex class action litigation and who will vigorously pursue this litigation on behalf of the Class.

68.     A class action is superior to other methods of adjudicating this controversy.

69.     The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

70. Defendants have acted or refused to act on grounds generally applicable to Plaintiff and the Class alike.

71. Questions of law and fact common to members of the Class predominate over any individual questions that may be alleged to affect only individual Class Members.

72. The damages sustained by the individual Class Members will not be large enough to justify individual actions when considered in proportion to the significant costs and expenses necessary to prosecute a claim of this nature against Defendants. The expense and burden of individual litigation would make it impossible for members of the Class individually to address the wrongs done to them.

73. Even if every Class Member could afford individual litigation, the court system could not. Class treatment, on the other hand, will permit the adjudication of claims of Class Members who could not individually afford to litigate their claims against Defendants and will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that individual actions would entail.

74. No difficulties are likely to overcome the manageability of this class action, and no superior alternative exists for the fair and efficient adjudication of this controversy.

## VI. CAUSES OF ACTION

### COUNT I
### MISSOURI MERCHANDISING PRACTICES ACT
### R.S.Mo. §§ 407.010 *et seq.*
### (Against All Defendants)

75. Plaintiff repeats and realleges the allegations against Defendants stated above as if fully set forth herein.

76. Plaintiff and the Members of the Class are "person[s]" as defined by R.S.Mo. §

407.010 who have lost money or property as a result of Defendants' unfair and deceptive business practices.

77.     Defendants' online casinos constitutes "merchandise," and Plaintiff and the Class use of the same constitutes a "sale" in "trade or commerce" as those terms are used in R.S.Mo. § 407.010 et seq.[22]

78.     Defendants' online casino services and products are unfair and deceptive as complained of herein, and the Defendant's use thereof constitutes the use of "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce" as those terms are used in R.S.Mo. § 407.020.  Defendants' action of labeling the online casino that sold services to Plaintiff and the proposed class as being only a "social casino" as opposed to a real one was unfair and deceptive because Missouri gambling consumers in the end received something different than what they reasonably expected and bargained to receive based on Defendants' deceptive and misleading sales tactics as described herein.  Drake and Ross deceptively and fraudulently misrepresent, as does Stake itself, that Stake is a social casino and not a real one in their promotional role for Stake, and they also fraudulently and deceptively misrepresent that they only gamble with their own money on Stake.

79.     Defendants at all times acted willfully and intended to mislead Plaintiff and the proposed class and induce them to rely on Defendants' misrepresentations and omissions about the nature of their online gambling casino, justifying an award of punitive damages under § 407.025(2)(1) of the MMPA.

---

[22] *See Raster v. Ameristar Casinos, Inc.,* 280 S.W.3d 120, 131 (2009) (gambling by dropping a coin into a slot machine was considered to be purchasing merchandise).

80.     Given Missouri's strong public policy against illegal online gambling, Defendants' fraudulent, misleading, and deceptive practices adversely affected the public interest.

81.     Plaintiff and the proposed class seek all monetary and non-monetary relief allowed by law, including damages; injunctive or other equitable relief; and attorneys' fees disbursements, and costs.

**COUNT II**
**UNJUST ENRICHMENT**
**(Against All Defendants)**

82.     Plaintiff repeats and realleges the allegations against Defendants stated above as if fully set forth herein.

83.     Defendants knowingly engaged in the conduct detailed above and challenged by this action. The allegations contained in the foregoing paragraphs are incorporated and repeated in this paragraph.

84.     Defendants have illegally taken money from Plaintiff and the Class.

85.     Defendants knew that they took this money wrongfully given their fraudulent intent and Missouri's statewide ban on online casino gambling.

86.     Defendants' taking of money and property from Plaintiff and the proposed class has unjustly enriched Defendants at the expense of Plaintiff and the Class.

87.     Under these circumstances, it is inequitable for the Defendants to retain the monies they have wrongfully taken from Plaintiff and the proposed class.

88.     Plaintiff and Class Members do not have an adequate remedy at law except as asserted in this Complaint.

**COUNT III**
**VIOLATION OF R.S.Mo. § 434.010** *et seq.*
**(Against Defendant Stake)**

89.     Section 434.030 of the Missouri Statutes allows gamblers to sue for their gambling

losses in certain circumstances. The statute provides that:

> Any person who shall lose any money or property at any game at cards, or at any gambling device, may recover the same by action of debt, if money; if property, by action of trover, replevin or detinue.

*Id.*

90.     Plaintiff and the proposed class are "person[s] who shall lose any money or property at any game, gambling device or by any bet or wager whatever" as defined in R.S.Mo. § 434.030 to Defendant Stake. Stake's gambling products and services are a "gambling device" and in some instances also a "game at cards" covered by this statute. Plaintiff and the proposed class paid Stake consideration for using its gambling device in the form of their gambling losses and related fees and payments to Stake. Stake should be ordered to reimburse Plaintiff and the proposed class for their gambling losses under this statute.

## VII.    <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff requests that:

A.     The Court determine this action may be maintained as a class action pursuant to Missouri Supreme Court Rule 52.08 and/or R.S.Mo. § 407.025, with Plaintiff being designated as representatives of such class and Plaintiff's undersigned counsel as Class Counsel;

B.     The Court enter award of damages in an amount to be determined at trial or by this Court and an order of equitable disgorgement against Defendants;

C.     The Court enter an order for injunctive relief, enjoining Defendants from engaging in the wrongful and unlawful acts described herein;

D.     The Court enter an award of statutory interest and penalties;

E.     The Court enter an award of costs and attorneys' fees; and

F.      The Court order other relief as the Court may deem just and proper.


Dated:  October 27, 2025                          CAREY DANIS & LOWE

                                        By:      /s/ James J. Rosemergy
                                                 James J. Rosemergy, #50166
                                                 8235 Forsyth Blvd, Suite 1100
                                                 Clayton, MO 63105
                                                 314-725-7700
                                                 314-721-0905 (fax)
                                                 jrosemergy@careydanis.com

                                                 Steven A. Schwartz
                                                 Beena M. McDonald
                                                 CHIMICLES SCHWARTZ KRINER
                                                 & DONALDSON-SMITH LLP
                                                 361 W. Lancaster Avenue
                                                 Haverford, PA  19041
                                                 Tel. No. (610) 642-8500
                                                 sas@chimicles.com
                                                 bmm@chimicles.com


                                                 Garrett W. Wotkyns
                                                 CHIMICLES SCHWARTZ KRINER
                                                    & DONALDSON-SMITH LLP
                                                 18146 North 93rd Place
                                                 Scottsdale, AZ 85255
                                                 Tel. No. (610) 642-8500
                                                 garrettwotkyns@chimicles.com

                                                 Jarrett L. Ellzey
                                                 Texas Bar No. 24040865
                                                 Josh Sanford
                                                 Arkansas Bar No. 2001037
                                                 Tom Kherkher
                                                 Texas Bar No. 24113389
                                                 EKSM, LLP
                                                 4200 Montrose Blvd, Suite 200
                                                 Houston, Texas 770006
                                                 Telephone: (888) 350-3931
                                                 jellzey@eksm.com
                                                 jsanford@eksm.com
                                                 tkherkher@eksm.com
                                                 Service: service@eksm.com



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>JAMES FRANCIS KANATZAR | Case Number: 2516-CV35089 |
|---|---|
| Plaintiff/Petitioner:<br>JUSTIN KILLHAM | Plaintiff's/Petitioner's Attorney/Address:<br>JAMES J ROSEMERGY<br>8235 FORSYTH BLVD<br>SUITE 1100<br>ST LOUIS, MO 63105 |
| vs. | |
| Defendant/Respondent:<br>SWEEPSTEAKS LIMITED | Court Address:<br>308 W Kansas<br>INDEPENDENCE, MO 64050 |
| Nature of Suit:<br>CC Other Tort | |
| | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to: **SWEEPSTEAKS LIMITED**
**Alias:**

**13101 PRESTON RD.**
**STE. 110-5027**
**DALLAS, TX 75240**

*COURT SEAL OF*

        You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the plaintiff/petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

        29-OCT-2025
        Date                                           Clerk

*JACKSON COUNTY*     Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1.  I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.  My official title is _____ of _____ County, _____ (state).
3.  I have served the above summons by: (check one)
    ☐ delivering a copy of the summons and petition to the Defendant/Respondent.
    ☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.
    ☐ (for service on a corporation) delivering a copy of the summons and petition to _____ (name) _____ (title).
    ☐ other _____.
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____                    _____
Printed Name of Sheriff or Server          Signature of Sheriff or Server

                **Subscribed and sworn to** me before this _____ (day) _____ (month) _____ (year)
                I am: (check one)  ☐ the clerk of the court of which affiant is an officer.
                                   ☐ the judge of the court of which affiant is an officer.
*(Seal)*                           ☐ authorized to administer oaths in the state in which the affiant served the above summons.
                                      (use for out-of-state officer)
                                   ☐ authorized to administer oaths. (use for court-appointed server)

                                   _____
                                   Signature and Title

| **Service Fees, if applicable** | |
|---|---|
| Summons | $_____ |
| Non Est | $_____ |
| Mileage | $_____ (_____ miles @ $_____ per mile) |
| **Total** | $_____ |

**See the following page for directions to officer making return on service of summons.**

OSCA (11/2021) SM60 (JAKSMOS) For Court Use Only: Document ID# 25-SMOS-1530   1 of 2        (2516-CV35089)
Rules 54.06, 54.07, 54.14, 54.20; 506.500, 506.510 RSMo

Case 4:25-cv-00990-DGK    Document 1    Filed 12/23/25    Page 48 of 59

# Directions to Officer Making Return on Service of Summons

A copy of the summons and petition must be served on each defendant/respondent. If any defendant/respondent refuses to receive the copy of the summons and petition when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and petition and the defendant's/respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and petition personally to the individual or by leaving a copy of the summons and petition at the individual's dwelling house or usual place of abode with some person at least 18 years of age residing therein, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and petition to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and petition to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the defendant/respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than 10 days nor more than 30 days from the date the defendant/respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

6/2020



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| | |
|---|---|
| Judge or Division:<br>JAMES FRANCIS KANATZAR | Case Number: 2516-CV35089 |
| Plaintiff/Petitioner:<br>JUSTIN KILLHAM | Plaintiff's/Petitioner's Attorney/Address:<br>JAMES J ROSEMERGY<br>8235 FORSYTH BLVD<br>SUITE 1100<br>ST LOUIS, MO 63105 |
| vs. | |
| Defendant/Respondent:<br>SWEEPSTEAKS LIMITED | Court Address:<br>308 W Kansas<br>INDEPENDENCE, MO 64050 |
| Nature of Suit:<br>CC Other Tort | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to: **ADIN ROSS**
**Alias:**

**14851 SW 21ST ST**
**DAVIE, FL 33326**

*COURT SEAL OF*

      You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the plaintiff/petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

*JACKSON COUNTY*

   29-OCT-2025
     Date                                               Clerk

Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1. I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2. My official title is _____ of _____ County, _____ (state).
3. I have served the above summons by: (check one)
   - ☐ delivering a copy of the summons and petition to the Defendant/Respondent.
   - ☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with _____, a person at least 18 years of age residing therein.
   - ☐ (for service on a corporation) delivering a copy of the summons and petition to _____ (name) _____ (title).
   - ☐ other _____.

Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____       _____
Printed Name of Sheriff or Server       Signature of Sheriff or Server

**Subscribed and sworn to** me before this _____ (day) _____ (month) _____ (year)
I am: (check one)
   - ☐ the clerk of the court of which affiant is an officer.
   - ☐ the judge of the court of which affiant is an officer.
   - ☐ authorized to administer oaths in the state in which the affiant served the above summons. (use for out-of-state officer)
   - ☐ authorized to administer oaths. (use for court-appointed server)

*(Seal)*

_____
Signature and Title

| Service Fees, if applicable | | |
|---|---|---|
| Summons | $ _____ | |
| Non Est | $ _____ | |
| Mileage | $ _____ | ( _____ miles @ $ _____ per mile) |
| **Total** | $ _____ | |

**See the following page for directions to officer making return on service of summons.**

## Directions to Officer Making Return on Service of Summons

A copy of the summons and petition must be served on each defendant/respondent. If any defendant/respondent refuses to receive the copy of the summons and petition when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and petition and the defendant's/respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and petition personally to the individual or by leaving a copy of the summons and petition at the individual's dwelling house or usual place of abode with some person at least 18 years of age residing therein, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and petition to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and petition to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the defendant/respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than 10 days nor more than 30 days from the date the defendant/respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.

## SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

6/2020



# IN THE 16TH JUDICIAL CIRCUIT COURT, JACKSON COUNTY, MISSOURI

| Judge or Division:<br>JAMES FRANCIS KANATZAR | Case Number: 2516-CV35089 |
|---|---|
| Plaintiff/Petitioner:<br>JUSTIN KILLHAM | Plaintiff's/Petitioner's Attorney/Address:<br>JAMES J ROSEMERGY<br>8235 FORSYTH BLVD<br>SUITE 1100<br>vs. ST LOUIS, MO 63105 |
| Defendant/Respondent:<br>SWEEPSTEAKS LIMITED | Court Address:<br>308 W Kansas<br>INDEPENDENCE, MO 64050 |
| Nature of Suit:<br>CC Other Tort | (Date File Stamp) |

## Summons for Personal Service Outside the State of Missouri
### (Except Attachment Action)

The State of Missouri to: **AUBREY DRAKE GRAHAM**
                **Alias:**

**10000 CHAMPION DR.**
**WASHINGTON, TX 77880**

*COURT SEAL OF*

           You are summoned to appear before this court and to file your pleading to the petition, copy of which is attached, and to serve a copy of your pleading upon the attorney for the plaintiff/petitioner at the above address all within 30 days after service of this summons upon you, exclusive of the day of service. If you fail to file your pleading, judgment by default will be taken against you for the relief demanded in this action.

         <u>29-OCT-2025</u>
              Date                                           Clerk

*JACKSON COUNTY*
       Further Information:

### Officer's or Server's Affidavit of Service

I certify that:
1.   I am authorized to serve process in civil actions within the state or territory where the above summons was served.
2.   My official title is _____ of _____ County, _____ (state).
3.   I have served the above summons by: (check one)
       ☐ delivering a copy of the summons and petition to the Defendant/Respondent.
       ☐ leaving a copy of the summons and petition at the dwelling place or usual abode of the defendant/respondent with
           _____, a person at least 18 years of age residing therein.
       ☐ (for service on a corporation) delivering a copy of the summons and petition to
           _____ (name) _____ (title).
       ☐ other _____.
Served at _____ (address)
in _____ County, _____ (state), on _____ (date) at _____ (time).

_____           _____
Printed Name of Sheriff or Server           Signature of Sheriff or Server

          **Subscribed and sworn to** me before this _____ (day) _____ (month) _____ (year)
          I am: (check one) ☐ the clerk of the court of which affiant is an officer.
                       ☐ the judge of the court of which affiant is an officer.
*(Seal)*                ☐ authorized to administer oaths in the state in which the affiant served the above summons.
                       (use for out-of-state officer)
               ☐ authorized to administer oaths. (use for court-appointed server)

                                 _____
                                       Signature and Title

| **Service Fees, if applicable** | |
|---|---|
| Summons | $ _____ |
| Non Est | $ _____ |
| Mileage | $ _____ ( _____ miles @ $ _____ per mile) |
| **Total** | $ _____ |

          **See the following page for directions to officer making return on service of summons.**

OSCA (11/2021) SM60 (JAKSMOS) *For Court Use Only:* **Document ID#: 25-SMOS-1532**   1 of 2   **(2516-CV35089)**    Rules 54.06, 54.07, 54.14, 54.20; 506.500, 506.510 RSMo

Case 4:25-cv-00990-DGK    Document 1    Filed 12/23/25    Page 54 of 59

## Directions to Officer Making Return on Service of Summons

A copy of the summons and petition must be served on each defendant/respondent. If any defendant/respondent refuses to receive the copy of the summons and petition when offered, the return shall be prepared accordingly so as to show the offer of the officer to deliver the summons and petition and the defendant's/respondent's refusal to receive the same.

Service shall be made: (1) On Individual. On an individual, including an infant or incompetent person not having a legally appointed guardian, by delivering a copy of the summons and petition personally to the individual or by leaving a copy of the summons and petition at the individual's dwelling house or usual place of abode with some person at least 18 years of age residing therein, or by delivering a copy of the summons and petition to an agent authorized by appointment or required by law to receive service of process; (2) On Guardian. On an infant or incompetent person who has a legally appointed guardian, by delivering a copy of the summons and petition to the guardian personally; (3) On Corporation, Partnership or Other Unincorporated Association. On a corporation, partnership or unincorporated association, by delivering a copy of the summons and petition to an officer, partner, or managing or general agent, or by leaving the copies at any business office of the defendant/respondent with the person having charge thereof or by delivering copies to its registered agent or to any other agent authorized by appointment or required by law to receive service of process; (4) On Public or Quasi-Public Corporation or Body. Upon a public, municipal, governmental or quasi-public corporation or body in the case of a county, to the mayor or city clerk or city attorney in the case of a city, to the chief executive officer in the case of any public, municipal, governmental, or quasi-public corporation or body or to any person otherwise lawfully so designated.

Service may be made by an officer or deputy authorized by law to serve process in civil actions within the state or territory where such service is made.

Service may be made in any state or territory of the United States. If served in a territory, substitute the word "territory" for the word "state."

The office making the service must swear an affidavit before the clerk, deputy clerk, or judge of the court of which the person is an officer or other person authorized to administer oaths. This affidavit must state the time, place, and manner of service, the official character of the affiant, and the affiant's authority to serve process in civil actions within the state or territory where service is made.

Service must not be made less than 10 days nor more than 30 days from the date the defendant/respondent is to appear in court. The return should be made promptly and in any event so that it will reach the Missouri Court within 30 days after service.

Case 4:25-cv-00990-DGK   Document 1   Filed 12/23/25   Page 55 of 59

# SUMMONS/GARNISHMENT SERVICE PACKETS
## ATTORNEY INFORMATION

Under the Missouri e-filing system now utilized by the 16th Judicial Circuit Court, once a case has been accepted for filing, a clerk prepares the necessary documents for service. The summons/garnishment is sent to the attorney by an e-mail containing a link so that the filer may print and deliver the summons/garnishment, pleadings and any other necessary documents to the person designated to serve the documents.

Pursuant to State statutes, Supreme Court Rules and Local Court Rules, attorneys are required to print, attach and serve specific documents with certain types of Petitions and other filings.

Please refer to the Court's website for instructions on how to assemble the service packets at:

16thcircuit.org → Electronic Filing Information → Required Documents for Service – eFiled cases → Summons/Garnishment Service Packet Information.

Please review this information periodically, as revisions are frequently made.   Thank you.


Circuit Court of Jackson County

6/2020

Electronically Filed - JACKSON - INDEPENDENCE - December 18, 2025 - 02:00 PM

**IN THE CIRCUIT COURT OF JACKSON COUNTY, MISSOURI
AT INDEPENDENCE**

|  |  |
|---|---|
| **JUSTIN KILLHAM, individually and on behalf of all others similarly situated**, <br><br> **Plaintiff,** <br><br> **v.** <br><br> **SWEEPSTEAKS LIMITED, ADIN ROSS, AND AUBREY DRAKE GRAHAM**, <br><br> **Defendants.** | Case No.: 2516-CV35089 |

**JOINT STIPULATION REGARDING ACCEPTANCE
OF SERVICE AND DEFENDANTS' TIME TO ANSWER
MOVE, OR OTHERWISE RESPOND TO THE PETITION**

Plaintiff Justin Killham and Defendants Sweepsteaks Limited, Adin Ross, and Aubrey Drake Graham, by and through undersigned counsel, hereby file this Stipulation agreeing as follows:

1.    Plaintiff filed the Petition in this action on October 27, 2025.

2.    Defendants have not yet been served with the Summons and Petition.

3.    Each Defendant has agreed to acknowledge receipt of the Summons and Petition to permit Plaintiff to avoid the time and expense associated with service of the Summons and Petition on the Defendants.

4.    In exchange for acknowledging receipt of the Summons and Petition, Defendants have requested an extension of time for each Defendant to file an answer, motion (including a motion to compel arbitration), or other response to the Petition.

5.    The Parties have conferred, and, in an effort to preserve the resources of the Parties and the Court, have agreed to set a joint response deadline for Defendants to answer,

1

move, or otherwise respond to the Petition of February 6, 2026.

      6.     Should any Defendant file a motion requiring a response, Defendants have agreed to a corresponding extension of time for Plaintiff to file his response until April 3, 2026.

      7.     Defendants hereby acknowledged due and legal service of the Summons and Petition, and waive formal service and all additional service of process, and any objections thereto, pursuant to Mo. Sup. Ct. R. 54.01 *et seq.*

      8.     Nothing in this Stipulation shall be construed as a waiver of any rights or positions in law or equity, or as a waiver of any defense, except as to sufficiency of process and sufficiency of service of process, that any Defendant would otherwise have.

      WHEREFORE, the Parties respectfully request that the Court enter an order extending the time for each Defendant to file an answer, motion (including a motion to compel arbitration), or other response to the Petition up to and including February 6, 2026, and for Plaintiffs to respond thereto up to and including April 3, 2026.

Date: December 17, 2025

Respectfully submitted,

CAREY DANIS & LOWE

*/s/James J. Rosemergy (with permission)*
James J. Rosemergy, #50166
8235 Forsyth Blvd, Suite 1100
Clayton, MO 63105
314-725-7700
314-721-0905 (fax)
jrosemergy@careydanis.com

Steven A. Schwartz (PA Bar No. 50579)
Beena M. McDonald (PA Bar No. 83315)
CHIMICLES SCHWARTZ KRINER
  & DONALDSON-SMITH LLP
361 W. Lancaster Avenue
Haverford, PA 19041
T: (610) 642-8500
*sas@chimicles.com*

GOOSMANN LAW FIRM

*/s/ Steven C. Henricks*      \_\_
Steven C. Henricks, #51566
Goosmann Law Firm, PLC
17838 Burke Street, Suite 250
Omaha, NE 68118
Tel. 402.282.8538
henrickss@goosmannlaw.com

A. Jeff Ifrah*
D.C. Bar No. 456661
Robert W. Ward*
D.C. Bar No. 90033268
IFRAH PLLC
1717 Pennsylvania Avenue, NW
Suite 650
Washington, D.C. 20006

2

*bmm@chimicles.com*

Garrett W. Wotkyns (AR Bar No. 025887)
CHIMICLES SCHWARTZ KRINER
  & DONALDSON-SMITH LLP
18146 North 93rd Place
Scottsdale, AZ 85255
T: (610) 642-8500
*garrettwotkyns@chimicles.com*

Jarrett L. Ellzey (TX Bar No. 24040865)
Josh Sanford (AR Bar No. 2001037)
Tom Kherkher (TX Bar No. 24113389)
EKSM, LLP
4200 Montrose Blvd, Suite 200
Houston, Texas 770006
T: (888) 350-3931
*jellzey@eksm.com*
*jsanford@eksm.com*
*tkherkher@eksm.com*
Service: service@eksm.com

*Counsel for Plaintiffs and the Proposed
Class*

*Counsel for Defendants Sweepstakes
Limited and Aubrey Drake Graham*


NEIMAN MAYS FLOCH &
ALMEIDA, PLLC

By: */s/Brandon S. Floch* (with
permission)
Brandon S. Floch
Florida Bar No. 125218
bfloch@nmfalawfirm.com
Christopher D. Joyce
Florida Bar No. 1020006
cjoyce@nmfalawfirm.com
201 South Biscayne Blvd., Suite 1300
Miami, Florida 33131
Phone: (305) 434-4943

*Counsel for Defendant Adin Ross*


\* *pro hac vice* forthcoming

3